GRIFFIS, P.J.,
for the Court:
MODIFIED OPINION ON MOTION FOR REHEARING
¶ 1. The motion for rehearing is granted. The Court’s original opinion is withdrawn, and this opinion is substituted in lieu thereof.
¶ 2. Bradley Wayne Smullins filed for a divorce from his wife Shellie Smullins and requested custody of their son, Devinn Smullins. The Chancery Court of Tishom-ingo County granted the divorce and awarded custody of Devinn to Bradley. Shellie raises two issues on appeal: (1) whether the chancellor erred in his analysis of the Albright factors and by awarding custody of Devinn to Bradley and (2) whether the chancellor erred by denying her motion for a new trial or, alternatively, motion for reconsideration in spite of new DNA evidence proving that Bradley is not Devinn’s biological father. We find no error and affirm.
FACTS AND PROCEDURAL HISTORY
¶ 3. Bradley and Shellie were married on March 26, 2001. At the time of their marriage, Shellie had two daughters from a previous relationship. Eight months later, on November 24, 2001, Shellie gave birth to Devinn.
¶ 4. In March 2008, Shellie left the marital home. Shellie’s two daughters and De-vinn remained with Bradley. On April 8, 2008, Shellie took the children out of school and did not return them to Bradley. The same day, Bradley filed a complaint for divorce based on the ground of adultery, emergency child custody, and other relief.
¶ 5. On April 9, 2008, the chancellor entered an emergency custody order. The chancellor found that it was in the best interests of the children to remain in the primary care and custody of Bradley. The chancellor set a temporary hearing for May 1, 2008.
¶ 6. On April 14, 2008, Shellie filed a motion to set aside the emergency custody order. The same day, the chancellor set the matter for hearing on April 18, 2008; the hearing was later continued.
¶ 7. On April 18, 2008, Shellie filed her answer to the complaint for divorce, child custody, and other relief and her counter-complaint for divorce, child custody, and other relief. Shellie asked for a divorce on the grounds of cruel and inhuman treatment and habitual drunkenness and drug use. As to custody, Shellie asked that Bradley’s request for custody of her daughters be dismissed because he was not their biological father. The chancellor agreed and dismissed Bradley’s request for custody of Shellie’s daughters. Shellie also asked that she be awarded custody of Devinn. This appeal concerns the custody of Devinn.
¶ 8. The trial was held on July 31, 2008, and August 5, 2008. Shellie and Bradley announced that they had agreed to withdraw their fault grounds for divorce and proceed with a divorce based on irreconcil *123 able differences. The issues of custody, visitation, and child support were submitted to the chancellor for a decision.
¶ 9. Shellie testified that she left Bradley because of his drinking and because he urinated in the bed. Shellie testified that everyday when Bradley returned home from work, he drank beer and smoked marijuana outside in the shed. Shellie claimed that Bradley’s addictions prevented him from interacting with the family. When Shellie worked the night shift, Jacie Jones, Shellie’s twelve-year-old daughter, baby-sat the children. Shellie testified that when she took the children away from Bradley in April 2008, they stayed with her friend Brian Hill for a few days. Shel-lie denied having an affair with Hill.
¶ 10. At the time of the hearing, Shellie was renting a house from her brother for $400 per month. Her grandparents lived nearby. However, Shellie stated that she did not ask her grandparents for help because of their age. Shellie testified that Jacie baby-sits while she is working.
¶ 11. Bradley testified that Shellie left him for Hill. Bradley learned about Shel-lie’s affair with Hill by viewing Shellie’s phone records. Bradley testified that Shellie had also had an affair with Chris Banks in 2008. Bradley also testified that Shellie had a profile on an Internet-dating website, which he did not approve. Bradley expressed concern about Shellie having the children around other men. Also, because Shellie had filed for bankruptcy in 2008, Bradley claimed that he was more financially stable than Shellie.
¶ 12. Bradley admitted that he drank six to eight beers per day, and he admitted using marijuana on a daily basis. However, Bradley testified that he never drank or smoked in front of the children, and he claimed that he had been sober ever since he had obtained custody of the children. He stated that he had taken four drug tests over the past year, and all tests results were negative. Bradley stated that when Shellie worked the night shift, he was the primary caretaker for the children: feeding them, bathing them, and taking care of their other needs. Lastly, Bradley testified that he had the ability to take care of Devinn and that his parents, who lived next door to him, were willing to help.
¶ 13. Banks, Shellie’s former boyfriend, testified that he and Shellie had an affair in 2003. Banks stated that he and Shellie had sex on back roads and at friends’ houses. Banks testified that Shellie brought her children to two of his baseball games, and they never did anything inappropriate in front of the children.
¶ 14. Elizabeth Smullins, Bradley’s mother, testified that Bradley normally took care of the children because Shellie worked the night shift. She confirmed that Bradley had not had a drink or smoked marijuana since he had obtained temporary custody of the children. Elizabeth stated that Bradley had not attended a rehabilitation program, but he had sought counseling from his pastor. Elizabeth also voiced her willingness to assist Bradley in Devinn’s care.
¶ 15. Chris Murrah, Bradley’s friend, observed Bradley taking care of the children. Murrah never saw Bradley drink or smoke marijuana in front of the children. Murrah also testified that he had given Bradley urine for a drug test once because Bradley had been smoking marijuana.
¶ 16. Debbie Netherly, Shellie’s mother, testified that she would call to check on the children when Shellie worked the night shift, and it sounded like a circus in the home. Netherly stated that Bradley was always outside in the shed when she called the home. Netherly maintained that whenever she visited Shellie and Bradley’s *124 home, Bradley always had a cup in his hand, and he smelled of beer.
¶ 17. Jacie testified that Shellie would take them to and from school. Jacie stated that in the afternoons, they would go to Bradley’s parents’ house or stay at home alone, where Jacie would look after her siblings. Jacie testified that Bradley would get home from work between 3:00 p.m. and 5:00 p.m., and that he would go to the shed to drink. Jacie maintained that Bradley would not check on them, and he did not spend a lot of time with them. Jacie stated that she was responsible for making dinner and getting the children ready for bed. Sometimes, Bradley would help Jacie make dinner.
¶ 18. On August 8, 2008, the chancellor announced his findings of fact and conclusions of law. The chancellor’s decision comprised approximately fifty pages of the transcript and provided his detailed analysis of the Albright factors that led to his conclusions. The chancellor determined that the parties should be awarded joint legal custody, and Bradley should be awarded sole physical custody of Devinn. The chancellor’s opinion was incorporated in the judgment of divorce that the chancellor executed on September 16, 2008.
¶ 19. On September 26, 2008, Shellie filed her Motion for New Trial or, in the alternative, Motion for Reconsideration. In the motion, Shellie alleged:
III.
[Shellie] would show through testimony and through documentation that Devinn Smullins was conceived prior to the marriage, and that Parties knew of the possibility that [Bradley] was not Devinn’s biological father;
IV.
[Shellie] would show that on August 9, 2008, [Shellie] took the minor child De-vinn Smullins, to a certified lab for the purposes of DNA testing and that the results of the test were sworn and subscribed to on August 15, 2008, that Wen-dle Allen Hunt is the biological father of Devinn Wayne Smullins. A copy of the DNA Test Report is attached hereto as Exhibit “A”;
V.
[Shellie] would further show that she has discussed the results of the test with Mr. Hunt who has expressed an interest and desire to be a father to Devinn and to build a relationship with him;
VI.
[Shellie] would further show that upon a hearing of this matter, Mr. Hunt would testify that he is disturbed to learn that his son is being raised by a second generation alcoholic drug addict;
Shellie asked the chancellor to grant a hearing on the “newly discovered evidence as to the paternity” of Devinn, and she requested that he determine “who is the appropriate person to be the custodial parent,” and to reconsider his findings on the Albright factors.
¶ 20. A hearing on the motion was held on March 12, 2009. Shellie testified that Bradley and she always knew that there was a possibility that Bradley was not Devinn’s biological father. However, Bradley declined to take a DNA test when Devinn was born.
¶ 21. The DNA test results determined that Wendell Hunt was Devinn’s biological father. Hunt testified that he and Shellie were once engaged several years ago, and he was unaware that he had fathered a son by Shellie. Hunt expressed a desire to establish a relationship with Devinn. However, the chancellor prohibited further *125 questions about Hunt’s desire to have visitation with or custody of Devinn.
¶ 22. At the conclusion of the hearing, the chancellor ruled that Shellie had failed to exercise due diligence in bringing this matter to the court’s attention. The chancellor also ruled that he had previously addressed the Albright factors in great length, and that he would not reconsider the issue. Thus, the chancellor denied the post-trial motions. The chancellor entered an order denying the post-trial motions on April 4, 2009. The order was filed on May 8, 2009, and a notice of appeal was filed on June 4, 2009.
ANALYSIS

I. Whether the chancellor erred in denying Shellie’s motion for a new trial.

¶ 23. We begin our analysis with the consideration of whether it was error for the chancellor to deny Shellie’s motion for a new trial. In Moore v. Jacobs, 752 So.2d 1013, 1017 (¶ 18) (Miss.1999), the Mississippi Supreme Court established the criteria for a trial court to grant a motion for a new trial based on newly discovered evidence. The supreme court held:
A motion for a new trial based on new evidence is an extraordinary motion, and the requirements of the rule must be strictly met. The motion may not be granted unless (1) the evidence was discovered following the trial; (2) due diligence on the part of the movant to discover the new evidence is shown or may be inferred; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; (5) the evidence is such that a new trial would probably produce a new result.
Id. (quoting Ag Pro, Inc. v. Sakraida, 512 F.2d 141, 143 (5th Cir.1975), rev'd on other grounds, 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976), cited with approval in Diaz v. Methodist Hosp., 46 F.3d 492, 495 (5th Cir.1995)).
¶ 24. To prevail, “[a] party asking for a new trial on the ground of newly discovered evidence must satisfy the [trial] court that the evidence has come to his knowledge since the trial, and that it was not owing to a want of diligence on his part that it was not discovered sooner.” Sullivan v. Heal, 571 So.2d 278, 281 (Miss.1990). “[F]acts implying reasonable diligence must be provided by the movant.” N.L.R.B. v. Jacob E. Decker & Sons, 569 F.2d 357, 363-64 (5th Cir.1978) (citation omitted).
¶25. Here, the chancellor concluded that Shellie had failed to exercise due diligence to discover the “new evidence” and to present the new evidence to the court prior to the entry of a final judgment. We may only reverse the chancellor’s decision to deny the motion for a new trial if we find he abused his discretion. United Servs. Auto. Ass’n v. Lisanby, 47 So.3d 1172, 1176 (¶ 9) (Miss.2010).
¶ 26. It is important to recognize that, prior to the chancellor’s decision and the judgment of divorce, Devinn’s paternity was not an issue that was litigated.
¶ 27. Indeed, Bradley’s initial complaint alleged that Devinn was “born of the marriage.” [1] Shellie’s answer admitted this *126 allegation. In her own counterclaim, Shel-lie asserted that “there was one (1) child born unto the union of this marriage, namely, Devinn Wayne Smullins.” Shellie signed and attached an affidavit that stated “the allegations and charges in said Answer and Counter-Complaint are true and correct.”
¶ 28. The parties agreed to an order that dismissed the fault grounds and asked the chancery court to award a divorce based on the ground of irreconcilable differences. The order consented to place the issues of custody of the minor child, child support, visitation, and related issues before the chancellor for a decision.[2] At the trial, the parties understood and agreed that the custody of Devinn would be decided by the chancellor.
¶ 29. Shellie was examined by both her attorney and Bradley’s attorney. Shellie’s testimony indicated that Bradley was De-vinn’s father. Shellie did not testify, or otherwise imply, that Bradley was not De-vinn’s biological father. Indeed, the trial transcript contains no evidence that could be considered to challenge Bradley’s parentage of Devinn or to raise this as an issue to be litigated.
¶ 30. Based on the pleadings and evidence received at trial, on August 8, 2008, the chancellor ruled:
The court hereby finds that the polestar consideration of this court has to be the best interest of this little boy. Accordingly, this court finds that the joint legal custody of this child is awarded to both the mother and the father, with the primary physical custody of this child being awarded to the father.
(Emphasis added).
¶ 31. The very next day, August 9, 2008, Shellie began a paternity test. Shel-lie and Devinn were tested by the DNA Diagnostics Center on August 9, 2008. Hunt was tested on August 12, 2008. The DNA test report was signed and notarized on August 15, 2008. The report indicated that Hunt was Devinn’s biological father, with a probability of paternity of 99.999996%.
¶ 32. Approximately a month later, on September 16, 2008, the chancellor entered the judgment of divorce, which had been approved as to form by Shellie’s attorney. Then, on September 26, 2008, Shellie filed her motion for a new trial, which for the first time disclosed the DNA Test Report. This was the first time Shellie had challenged Bradley’s parentage of Devinn.
¶ 33. On March 12, 2009, a hearing was held on the motion for a new trial. The chancellor received testimony from Shellie, Hunt, and Bradley. Shellie was asked “what happened.” She responded: “When me and Bradley got married, I was pregnant. I wasn’t sure. I asked Bradley if he wanted to get a test done. He never did. We never followed through.” She also testified that she never knew if Bradley was Devinn’s father.
¶ 34. At the conclusion of the hearing, the chancellor denied the motion and ruled:
The new evidence regarding the paternity of Devinn Wayne Smullins was not discovered until after the trial but was *127 known to [Shellie] prior to the entry of the judgment. Mississippi Rule of Civil Procedure 58 states that, “a judgment shall be effective only when entered.” Therefore, paternity of Devinn Wayne Smullins was known prior to the divorce becoming final but was not disclosed to this court.
Due diligence on the part of the movant to discover the new evidence is required. “A party cannot fail to investigate important information and then attempt to assert that information as new evidence at the end of the trial.” [citing Goode v. Synergy Corp., 852 So.2d 661, 664 (¶ 12) (Miss.Ct.App.2003) (quoting Diaz, 46 F.3d at 496.) ]
[Shellie] states in her motion that “De-vinn Smullins was conceived prior to the marriage and that [the] parties knew of the possibility that [Bradley] was not Devinn’s biological father.” [Bradley] denies any such knowledge in his response, but [Shellie] is now admitting she knew of the possibility at the time of the child’s birth on November 24, 2001, almost seven years before the complaint for divorce was filed and certainly before the judgment for divorce was entered. In the five months during which this divorce action was pending, [Shellie] not only failed to disclose this possibility in any of her pleadings but also failed to disclose at either of the hearings which occurred on July 31, 2008, and August 5, 2008, or when the bench opinion was delivered on August 8, 2008. The fact that the DNA paternity test was initiated by [Shellie] the day after the bench opinion was given further indicates that [Shellie] had information she “failed to investigate” until after the trial. It should also be noted once again that the results of this paternity test were received on August 15, 2008, over a month before the judgment for divorce was entered.
... [Shellie] has failed to provide evidence to this court that she exercised reasonable diligence in bringing this new evidence before the court. Therefore, no further analysis is needed....
¶ 35. Now on appeal, Shellie claims that she was diligent in bringing this “new evidence” before the chancellor. In the motion for new trial, Shellie alleged that “De-vinn Smullins was conceived prior to the marriage, and that Parties knew of the possibility that [Bradley] was not Devinn’s biological father.” In her brief before this Court, Shellie admits that she “knew at [Devinn]’s birth that Bradley could not be the father.” Both of these allegations are clear and emphatic admissions that there was no newly discovered evidence. Indeed, from the beginning of Devinn’s life, Shellie was aware of the fact that Bradley either was not or might not be Devinn’s biological father. Just like the chancellor, we fail to see how the paternity test results can be newly discovered evidence if she knew of the possibility of that very fact prior to the commencement of this legal action. Had Shellie alleged that, upon information and belief, Bradley was not De-vinn’s biological father, then that very issue could have be tried to the chancellor and considered in the final judgment. But she failed to do so.
¶ 36. Based on her own admissions and the sworn pleadings filed, we find the chancellor was correct in finding that Shel-lie failed to exercise due diligence to discover the new evidence. Thus, we find the chancellor did not abuse his discretion when he denied Shellie’s Rule 59 motion for a new trial. See M.R.C.P. 59. Therefore, we find no merit to this issue.

II. Whether the chancellor erred in the application of the Albright factors to award custody to Bradley.

¶ 37. Next, we consider whether the chancellor erred when he granted *128 Bradley custody of Devinn. The standard of review for a custody decision requires that we not disturb a chancellor’s decision regarding custody matters unless the chancellor has abused his discretion, was manifestly wrong, or applied an erroneous legal standard. Taylor v. Taylor, 909 So.2d 1280, 1281 (¶ 7) (Miss.Ct.App.2005). The chancellor’s findings of fact will stand as long as they are supported by substantial evidence. Id.
¶ 38. In Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983), the supreme court held:
We reaffirm the rule that the polestar consideration in child custody cases is the best interest and welfare of the child. The age of the child is subordinated to that rule and is but one factor to be considered. Age should carry no greater weight than other factors to be considered, such as: health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school[,] and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent[;] and other factors relevant to the parent-child relationship.
Marital fault should not be used as a sanction in custody awards. Relative financial situations is not controlling since the duty to support is independent of the right to custody. Differences in religion, personal values[,] and lifestyles should not be the sole basis for custody decisions.
¶ 39. Here, the chancellor considered each of the Albright factors in the bench opinion. The chancellor then concluded: “[T]his is a close case. It’s real close.” The judgment for divorce incorporated the bench opinion and amended it to conform to the final judgment. We will discuss each of the Albright factors.

1. Age, Sex, and Health of the Child

¶ 40. At the time of the trial, De-vinn was a six-year-old boy. The chancellor noted that the appellate courts have not determined an exact age at which the tender-years doctrine no longer applies. Thus, the chancellor concluded that Devinn was no longer of tender years and that he could be equally cared for by either parent. The chancellor emphasized the case of Sobieske v. Preslar, 755 So.2d 410 (Miss. 2000), where the father was granted custody of his six-year-old daughter because he had demonstrated the ability to appropriately take care of the children while they were temporarily placed in his custody. The chancellor also cited the principle that “a child is no longer of tender years when that child can be equally cared for by persons other than the mother.” Mercier v. Mercier, 717 So.2d 304, 307 (¶ 15) (Miss.1998). Apparently, the chancellor concluded that Bradley demonstrated the ability to care appropriately for Devinn while De-vinn was temporarily in his care. The chancellor ruled that “this is a male child, he’s six years of age, almost seven, his health is okay, this factor favors his father.”
¶ 41. Shellie argues that the chancellor placed too much emphasis on Bradley’s temporary care of Devinn and ignored the fact that she had taken care of Devinn prior to the parties’ separation. Shellie *129 has cited no authority that compels us to find the chancellor in error on this finding.

2. Continuity of Care Prior to the Separation

¶ 42. The chancellor determined that “this is the one that bothers me here and it’s hard to determine which one is doing— both of them ha[ve] testified that the other one took care of the children.” The chancellor determined that this factor favored Shellie.

3. Best Parenting Skills and Willingness and Capacity to Provide Primary Child Care

¶ 43. The chancellor concluded: “I question both of them on this issue. Where was the caretaker when he was out drinking in the shed? Where was the caretaker when momma was out having sex ... in the back of the car or in somebody else’s house?” Thus, the chancellor was concerned with Bradley’s alcohol use and Shellie’s sexual promiscuity. The chancellor found them both equally deficient in the area of parenting skills.
¶ 44. Shellie argues that the chancellor should have weighed this issue in her favor because Bradley’s alcohol and drug use limited his ability to parent. Shellie claims that there was no evidence that her extramarital affairs had any bearing on her parenting skills. She cites the principle that “marital fault should not be used as a sanction in custody awards.” Brekeen v. Brekeen, 880 So.2d 280, 287 (¶ 20) (Miss. 2004); Albright, 437 So.2d at 1005. She then claims that Bradley’s drug and alcohol use can be very detrimental to his parenting skills. Bradley admitted that he daily drank six to eight beers and smoked marijuana. There was also other testimony that Bradley routinely drank and smoked in the shed, leaving the children inside the home alone.
¶ 45. Bradley testified that he had been sober for one year. There was also other testimony that Bradley cooked, cleaned," and washed clothes.
¶ 46. The chancellor expressed his concern over Shellie’s phone calls to another man, with whom she was alleged to have had an affair, but she claimed was a friend. The chancellor also expressed his concerns about Shellie’s absence from her parental duties while she was involved in this non-marital relationship. Thus, the chancellor’s findings on this factor were not a sanction against an adulterous parent but instead considered the time and attention each parent paid to the children.
¶ 47. In fact, their parenting skills were the subject of much conflicting testimony. They both relied on Jacie, Shellie’s daughter, to assist in their parenting responsibilities. The chancellor expressed his concern on the issue of parenting skills, which this Court shares. However, based on the conflicting evidence, we cannot find that the chancellor committed error when he determined that this issue favored neither parent.

U. The Employment of the Parent and Responsibilities of that Employment

¶ 48. The chancellor concluded that both Shellie and Bradley were hard workers, who provide for their children. The chancellor found that this factor was equal for each parent. Shellie did not challenge this finding.

5. Physical and Mental Health and Age of the Parents

¶ 49. The chancellor found this factor to be equal for each party. The chancellor found that there was no health problem except that Shellie had a prescription for Zoloft for depression. She testi *130 fied that she had only taken one pill, and it was because she lived with an alcoholic. The chancellor was concerned with Bradley’s use of alcohol and his bed wetting that resulted from excessive drinking. Nevertheless, the chancellor ruled that this factor was equal to both parents.
¶ 50. We are concerned that the chancellor did not further elaborate under this factor about Bradley’s drug use. However, there is sufficient other discussion of Bradley’s drug use that indicates that the chancellor did not believe Bradley’s drug or alcohol use was of such severity that it negatively impacted his physical or mental health. Without more, we cannot say that the chancellor erred in this determination.

6. Emotional Ties of the Parent and Child

¶ 51. The chancellor found that both parents loved Devinn, and this factor was equal to both parents.
¶ 52. Shellie argues that the chancellor should have found this factor in her favor. She claims that Devinn sleeps with her, even though he has his own bed at her home. She also claims that Devinn chose to sit with Shellie during the trial and that she has a loving mother-son relationship.
¶ 53. We disagree and cannot find that the chancellor committed error when he determined that Devinn had strong emotional ties to both parents.

7. Moral Fitness of the Parents

¶ 54. The chancellor determined that this factor “bothers me greatly as to both of them.” The chancellor considered Bradley’s drinking in the shed, his exposure of the children to his “beer drinking,” and his pot smoking. He also considered the testimony that Bradley no longer drinks or smokes pot. The chancellor also considered Shellie’s sexual promiscuity and affairs. The chancellor noted the amount of time she spent on the phone with one of her paramours, and he questioned where the children were when this was going on. The chancellor also commented on Shel-lie’s online profile, “sweetie8549.” The chancellor considered both parties to be “equal on this and totally and greatly deficient.”
¶ 55. Shellie argues that her adultery alone should not disqualify her as the custodial parent. This is true. However, this Albright factor requires the chancellor to consider the moral fitness of the parents. The chancellor was concerned with both Shellie’s and Bradley’s moral fitness. We cannot find that the chancellor committed error when he determined that this issue favored neither parent.

8. The Home, School, and Community Record of the Child

¶ 56. The chancellor found Devinn to be an average student and his school record was pretty good so far. Jacie testified that Bradley helped her with her school work. The chancellor considered this factor equal. Shellie does not challenge this finding.

9. The Preference of the Child

¶ 57. The chancellor determined this factor was not applicable because Devinn was not at the age sufficient to express a preference by law. Shellie does not challenge this finding.

10. Stability of Home Environment and Employment of Each Parent

¶ 58. The chancellor determined that both Bradley and Shellie were employed, and their jobs were stable. The chancellor also determined that Bradley’s home was stable, and Shellie’s home envi *131 ronment was not stable. This finding is challenged by Shellie.
¶ 59. The chancellor’s oral findings are somewhat disjointed. The chancellor mentioned that Shellie left the home, but he stated: “I don’t blame her for leaving, but these children are just being juggled back and forth[,] and Devinn doesn’t know what’s coming or going.” The chancellor also considered the parties’ finances. The chancellor noted that Shellie has filed bankruptcy and signed up for an online dating service. And the chancellor concluded by finding that Bradley’s home was stable, “except for his drinking his beer.” Nevertheless, it appears that the chancellor’s ultimate conclusion was based on the fact that Bradley continued to live in the marital home while Shellie had moved around often.
¶ 60. There are several cases that support the finding that remaining in the marital home is a factor which weighs in favor of the stability of the home environment. In Woodham v. Woodham, 17 So.3d 153, 158 (¶ 17) (Miss.Ct.App.2009), the chancellor found that the stability of the home factor favored the father because “he remained in the marital home and accepted the support offered by his family.” This Court determined that the chancellor’s conclusion on this issue was “supported by substantial evidence.” Id.
¶ 61. We conclude that there was evidence to support the chancellor’s findings as to this factor.

11. Other Factors Relevant to the Parent-Child Relationship

¶ 62. Shellie argues that the chancellor should not have penalized her because her family does not live nearby. She also argues that the chancellor should have favored keeping the children together instead of separating them.
¶ 63. This Court has held: “The presence of extended family is a legitimate factor to support awarding custody to a parent.” Collins, 20 So.3d at 690 (¶ 31). Thus, we find that the chancellor could have legitimately considered this factor in favor of Bradley.
¶ 64. In regard to the chancellor’s separation of the children, “there is no general rule in this state that the best interest[s] of siblings [are] served by keeping them together.” Id. at 691 (¶ 37) (quoting C.W.L. v. R.A., 919 So.2d 267, 273 (¶ 21) (Miss.Ct.App.2005)). However, “while the placement of children with their siblings is not a concern that ‘overrides’ the best interest of the child, our case law makes it clear that keeping siblings together is assumed to be in the best interest of a child, absent a showing that the circumstances in a particular case are to the contrary.” Id. (quoting Owens v. Owens, 950 So.2d 202, 207 (¶ 16) (Miss.Ct.App.2006)).
¶ 65. Here, the chancellor recognized that this was a very close issue. He included a detailed discussion in which he considered whether it would be in the best interest of Devinn to separate him from his half-sisters. The chancellor determined that he believed the best interest of Devinn would be served by doing just that, and the chancellor awarded custody to Bradley. We conclude that the chancellor’s consideration of this factor was proper and was supported by the evidence.
¶ 66. The chancellor repeatedly admitted that this was a very close case. Indeed, it was. In Thurman v. Johnson, 998 So.2d 1026, 1030 (¶ 18) (Miss.Ct.App.2008), this Court held:
We also note that the Albright factors are simply a guide and not a set formula for determining custody as Deborah would suggest. The supreme court has *132 ruled that “[w]hile the Albright factors are extremely helpful in navigating what is usually a labyrinth of interests and emotions, they are certainly not the equivalent of a mathematical formula. Determining custody of a child is not an exact science.” Lee v. Lee, 798 So.2d 1284, 1288 (¶ 15) (Miss.2001). Thus, the fact that Deborah was slightly favored under two factors and Glen was favored under only one factor did not automatically make Deborah the better choice for the custodial parent. We must defer to the decision of the chancellor. “All the factors are important, but the chancellor has the ultimate discretion to weigh the evidence the way he sees fit.” Johnson v. Gray, 859 So.2d 1006, 1013-14 (¶ 36) (Miss.2003).
¶ 67. Neither Bradley nor Shellie presented all of the qualities of an ideal parent. However, they are human and are not perfect. Likewise, the chancellor here is not perfect, but he recognized that the case presented a very close question as to which parent should receive physical custody. We too recognize that Bradley and Shellie, though not perfect, loved Devinn very much, and they both desperately wanted to be the custodial parent. Unfortunately, only one could be awarded physical custody. The chancellor decided that Bradley should have that responsibility. We find that the record provides sufficient evidence to support the chancellor’s decision to grant Bradley custody of Devinn. Given our limited standard of review, and the fact that the chancellor’s findings were supported by the record, we cannot say that the chancellor was manifestly wrong or his decision was clearly erroneous. Accordingly, we find that this issue is without merit, and we affirm the chancellor’s judgment.
¶ 68. THE JUDGMENT OF THE CHANCERY COURT OF TISHOMIN-GO COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., MYERS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR. IRVING, P.J., DISSENTS WITHOUT SEPARATE OPINION. RUSSELL, J„ NOT PARTICIPATING.

. The supreme court, in Estate of Taylor, 609 So.2d 390, 394 (Miss.1992), held:
Our law has long presumed a child born during the course of a marriage to have been fathered by the husband. See Herring v. Goodson, 43 Miss. 392 (1870). We have called the presumption of legitimacy as "one of the strongest known to our law.” Karenina By Vronsky v. Presley, 526 So.2d 518, 523 (Miss.1988); Coleman v. Hudson, 396 So.2d 1024, 1026 (Miss.1981); Madden *126 v. Madden, 338 So.2d 1000, 1001 (Miss.1976).

. We do not find the agreed order in the record. However, the chancellor stated the terms of the agreed order at the beginning of the July 31, 2008, hearing, and the attorney for each party agreed on the record that the court’s understanding was correct. The chancellor then asked both Shellie and Bradley if "this is your understanding and you agree to abide by this?” They both answered, "yes, sir.”